**RECEIVED**

FEB 11 2015 $CV$

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

GE OIL & GAS, INC.

VERSUS

TURBINE GENERATION SERVICES,
L.L.C. and MICHEL B. MORENO

CIVIL ACTION NUMBER: 6:14-00760

JUDGE DOHERTY

MAGISTRATE JUDGE HILL

## <u>MEMORANDUM RULING</u>

Currently pending before the Court are the following motions: "GE Oil & Gas, Inc.'s Motion to Dismiss or for Judgment on the Pleadings in Response to Defendants' First Amended Counterclaim" [Doc. 18]; "GE Oil & Gas, Inc.'s Motion for Judgment on the Pleadings or, Alternatively, Summary Judgment" [Doc. 19]; and "General Electric Company's Motion to Dismiss or for Judgment on the Pleadings in Response to Defendants' Third Party Complaint" [Doc. 20]. For the following reasons, the motions to dismiss [Docs. 18, 20] are DENIED IN PART and GRANTED IN PART; the motion for summary judgment [Doc. 19] is DENIED in its entirety.

## I.      Factual Background

This suit was brought by plaintiff GE Oil & Gas, Inc. ("GEOG"), against Turbine Generation Services, L.L.C. ("TGS") and Michel B. Moreno (collectively "defendants"), for collection of a $25,000,000.00 loan GEOG made to TGS. [Doc. 1, ¶ 9] According to the complaint filed in this matter, on May 13, 2013, GEOG loaned TGS $25,000,000.00 to enable TGS to buy engine inventory and other equipment in order "to launch TGS' business." [Id. at ¶¶ 9, 10]  To evidence the loan, TGS, through Moreno (TGS's authorized officer), delivered to GEOG a Senior Secured Promissory Note ("the Note") in the face amount of $25,000,000.00 [Id.] The Note was originally scheduled to

mature and become due and payable on September 13, 2013, but the parties agreed to extend the maturity date to December 29, 2013. [Id. at ¶¶ 12, 15] To secure TGS' obligations to perform in accordance with the Note, TGS executed a security agreement granting GEOG a security interest in various property owned by TGS, and Moreno executed a Guaranty Agreement in favor of GEOG. [Id. at ¶¶ 16-17, 19] TGS failed to repay the loan on the maturity date of December 29, 2013. [Id. at ¶ 22] Thereafter, GEOG brought this suit for collection of the promissory note, turnover of the collateral, and enforcement of the payment guaranty. [Id. at pp. 7, 8, 10] Jurisdiction is based upon diversity of citizenship.

Defendants answered the suit and asserted the affirmative defense of equitable and/or promissory estoppel. [Doc. 7, p.7] Defendants additionally brought a counterclaim against GEOG, and a third-party complaint against General Electric Co. ("GE"), GEOG's parent company. [Docs. 7, 12, 15] Through their counterclaim and third-party complaint, defendants make the following allegations against GEOG and GE[1]:

In 2012, Moreno was affiliated with Green Field Energy Services, Inc. ("GFES"), a business operating in Louisiana with two divisions: a hydraulic fracturing division (commonly known as "fracking" or "fracing") and a well services division. [Doc. 12, ¶. 2] On or about September 13, 2012, Moreno approached executives with GEOG and GE about the possibility of forming a joint venture/partnership relationship involving both a fracking business and a power generation business. [Doc. 12, ¶¶ 2-3] Over the next five months, the parties held several meetings, and "conducted due diligence including field visits, product demonstrations, meetings with potential customers, financial

---

[1]For expediency purposes, the Court will cite only to the counterclaim; however, as the allegations in the counterclaim and third-party complaint are identical, the reader will find the corresponding allegation in the third-party complaint at the same paragraph number referenced in the counterclaim.

reviews of the proposed joint venture and market evaluations." [Id. at ¶ 4] In November of 2012, GFES entered into non-disclosure agreements with GEOG and GE, and GE Aero and GFES signed a Memorandum of Understanding addressing a joint development study, supply agreement and "commercialization of the 1-5 megawatt power generators." [Id. at ¶ 5]

In January 2013, GFES and GE released a joint announcement on the "Cooperation of Supply Chain." [Id. at ¶ 6] Between January 27-29, 2013, GE and Moreno made public the joint venture relationship at GE's Oil and Gas Worldwide Forum in Florence, Italy. [Id. at ¶ 7]  During this time, GE made its "first technical visit to assess the progress and status of the first power generation units." [Id.]

On or about March 8, 2013, GE executives "made the joint venture funding request" to GE's CEO. [Id. at ¶ 8] GE's CEO "decided to fund the joint venture out of his 'own' corporate budget to facilitate a quicker closing and to demonstrate his commitment to the joint venture internally within the GE organization." [Id.] Thereafter, GE executives advised Moreno by telephone of GE's approval of the joint venture relationship, and further instructed Moreno "to cease all ongoing discussions and negotiations with private equity firms for which Moreno was interviewing as possible partners in the joint venture." [Id. at ¶ 9] Moreno complied with GE's request. [Id. at ¶ 10]

In March 2013, Moreno attended a dinner in New Orleans, Louisiana with GE's board members and executives. [Id. at ¶ 11] At the dinner, Moreno was introduced "as GE's joint venture partner for turbine driven power generation and fracing endeavors." [Id.] In April 2013, Moreno met with GE's Senior Executive Director of Energy Ventures in Schenectady, New York, and the terms of the joint venture were finalized. [Id. at ¶ 12] "The terms of the joint venture were that GE, through one of its subsidiaries, would invest $200 million into the venture with $100 million committed to

fracing and $100 million committed to power generation." [Id. at ¶ 15] However, later that month "the parties agreed to exclude the fracing side of the business and form the joint venture around power generation only," due to "the unstable financial situation of GFES."[2] [Id. at ¶ 16] The parties further agreed GFES would divest itself of the power generation line of business, and GE, through its subsidiary GEOG, "would invest $100 million in the power generation joint venture." [Id.]

On May 7, 2013, Moreno formed TGS as "the vehicle through which the joint venture would be carried out with GEOG."[3] [Id. at ¶ 17] "The business of the joint venture centered around taking used helicopter turbines . . . and modifying the engines to be used in the oil fields of Texas and other shale plays around the country." [Doc. 12, ¶ 18] The parties' plan "was to ramp up the production of the turbines then sell the joint venture in 3½ to 4 years," as GEOG was of the opinion the joint venture "would have substantial net worth" by that time. [Id.]

In May of 2013, GE "committed to initially fund GEOG's $100 million promise by partially funding with a $25 million convertible loan because a 'safety engineering study' had to be completed before final funding of the joint venture could take place." [Id. at ¶ 19]

> On May 13, 2013, the Note was signed and funded which included the 'Term Sheet' for the joint venture. . . . The terms included, among other things, the $25 million convertible loan from GEOG to TGS, which was to be converted into TGS preferred membership interest on or about June 15, 2013. Ultimately, GEOG was to invest $100 million in the joint venture for a 50% stake in TGS.  In accordance with the joint venture agreement and the terms of the Note, TGS used the $25 million to purchase the turbines and other equipment in pursuit of the joint venture Business Plan.

[Id. at ¶ 20]

---

[2]In October 2013, GFES filed for bankruptcy. [Id. at ¶ 39]

[3]TGS is a Louisiana limited liability company, all members of which are citizens of Louisiana. [Doc. 1, ¶ 2; Doc. 7, ¶ 2]

The Term Sheet memorialized the joint venture agreement. [Id. at ¶ 23] According to the Term Sheet, the parties intended to create a partnership or joint venture agreement. [Id. at ¶ 24] The Term Sheet states "following the funding of the $25 million convertible loan, GEOG was to make the First Contribution on or about June 15, 2013," with the First Contribution consisting of "converting the $25 million convertible loan into preferred membership equity plus $25 million in additional cash." [Id. at ¶ 29] The Term Sheet sets forth certain terms that had to be met prior to funding of the First Contribution. [Id. at ¶ 31] "All such conditions pertaining to the First Contribution were either fully performed or waived by GE." [Id. at ¶ 32]

Prior to execution of the Note, GE "requested a personal guarantee of Moreno to 'make finance folks happy.'" [Id. at ¶ 21] GE's Director told Moreno "'not to worry about the guarantee because the loan would be converted to equity within 30 days' and that the guarantee 'would never be called.'" [Id.] On June 26, 2013, Moreno signed the personal guarantee, which was made retroactive to May 13, 2013. [Id.]

"During the period May 13, 2013 through June 15, 2013, GEOG and GE made no efforts whatsoever toward the execution of definitive documents necessary to consummate the proposed transactions [*i.e.* one of the conditions that had to met prior to funding the First Contribution] despite repeated email requests from Moreno to do so." [Id. at ¶ 30] Nevertheless, representatives of GE and GEOG "continued to mislead and induce Moreno into the notion that joint venture funding was imminent." [Id. at ¶ 33] To wit, in July of 2013, Moreno was contacted by a GEOG executive, and later by a GE executive, who assured Moreno the joint venture business was moving forward; in August 2013, Moreno attended a meeting in Houston, Texas with GE and GEOG executives, who again assured Moreno the joint venture business would be moving forward. [Id. at ¶¶ 33-35]

Nevertheless, on or about September 29, 2013, GE informed Moreno that GE's new Corporate Mergers and Acquisitions Director "did not feel comfortable with the joint venture arrangement," and that "GFES financial situation was the reason for the 'buyers' remorse.'" [Id. at ¶ 37]

By its counterclaim and third-party complaint, Moreno and TGS assert the following claims against GE and GEOG: (1) breach of partnership/joint venture duties, or alternatively, breach of agreement to form partnership/joint venture [Id. at 10, 12]; (2) breach of fiduciary duty [Id. at 9]; (3) promissory estoppel, or alternatively, fraud and fraud in the inducement [Id. at 13, 14].

## II.   Motions to Dismiss or for Judgment on the Pleadings [Docs. 18, 20]

Plaintiff GEOG and third-party defendant GE have brought identical motions to dismiss.[4] By way of these motions, GEOG seeks dismissal of all claims asserted in Moreno and TGS's First Amended Counterclaim [Doc. 12], and GE seeks dismissal of all claims asserted in Moreno and TGS's third-party complaint. Movants, GEOG and GE, argue Moreno and TGS have failed to state claims upon which relief can be granted. In the alternative, movants GEOG and GE seek a judgment on the pleadings dismissing Moreno and TGS's First Amended Counterclaim and third-party complaint.

### A.   Standards of Review

#### 1.   Motion to Dismiss

Motions to dismiss for failure to state a claim are appropriate when a defendant attacks the complaint because it fails to state a legally cognizable clam. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001). In other words, a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those

---

[4]As previously noted, defendants' counterclaim against GEOG and defendants' third-party complaint against GE are identical.

facts." *Id.* at 161–62. When deciding a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.2007) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir.2011)(internal quotation marks omitted). The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a district court generally "must limit itself to the contents of the pleadings, including attachments there to." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000). "The court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims." *Brand Coupon Network, L.L.C. v. Catalina Marketing Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).

### 2.     Motion for Judgment on the Pleadings

Pursuant to Fed. R Civ. P. 12(c), "After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings."   Fed.R.Civ.P. 12(c). "Rule 7(a) provides that the pleadings are closed upon the filing of a complaint and an answer (absent a court-ordered reply), unless a counterclaim, cross-claim, or third-party claim is interposed, in which event the filing of a reply to a counterclaim, cross-claim answer, or third-party answer normally will

mark the close of the pleadings."  5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (2014) (footnotes omitted); *see also American Const. Benefits Group, LLC v. Zurich American Ins. Co.*, 2013 WL 1797942, p.1, n.3 (N.D.Tex. 2013).  The pleadings in this matter have not closed, as GEOG has not filed a responsive pleading to defendants' counterclaim, and GE has not filed an answer to the third-party complaint.  Accordingly, the Court declines to consider the pending motion as a motion for judgment on the pleadings, as any such motion is premature until the pleadings have closed.

**B.     Breach of Partnership/Joint Venture Duties, or Alternatively, Breach of Agreement To Form Partnership/Joint Venture**

Moreno and TGS assert a claim for "breach of partnership/joint venture duties" against GEOG and GE. [Doc. 12, p.10; Doc. 15, p. 10]  By this claim, Moreno and TGS allege GEOG and GE "breached their duty of care under the law and under the partnership/joint venture agreement by failing to put forth a good faith effort to complete the prerequisites for the First Contribution after Moreno had performed his part of the bargain. . . ." [Id. at ¶ 48] Moreno and TGS assert GEOG and GE "failed to act with the care that an ordinarily prudent person would exercise in similar circumstances," failed to act in good faith, and "could not have reasonably believed that such conduct would be in the best interest of the partnership/joint venture." [Id. at ¶ 49]

Alternatively, Moreno and TGS assert a claim for "breach of agreement to form partnership/joint venture." [Id. at p. 12]  In support of their alternative cause of action, defendants allege:

> 54.     GEOG and GE agreed to enter into a joint venture and/or partnership with Moreno under the general terms outlined in the Term Sheet.
>
> 55.     All conditions precedent to the formation of the joint venture and/or partnership have been performed or have occurred.

56.    In accordance with that agreement, Moreno executed the Note in his capacity as TGS's C.E.O., and as the C.E.O. of TGS's parent, and TGS used the proceeds of the Note to purchase equipment to conduct the business of the joint venture and/or partnership.

57.    Rather than make the First Contribution and convert the Note to an ownership interest in TGS, GEOG and GE breached the agreement to form a joint venture and/or partnership by refusing to make the First Contribution and demanding payment on the Note.

58.    If GEOG and GE had not breached its agreement to form a joint venture and/or partnership with Moreno, the joint venture and/or partnership would have been duly formed. . . .

[Doc. 12, p. 13]

Whether a partnership or joint venture was created depends upon the contract between the parties and the law applicable to that contract. GEOG and GE, relying upon the Term Sheet, argue the Term Sheet "is expressly not binding on the parties," and thus, no joint venture or partnership was ever created. [Doc. 30-2, p. 3 (emphasis omitted)] Moreno and TGS, however, assert this claim is not for breaches of the Term Sheet, but rather, for "breach of partnership/joint venturer duties based on [a] preexisting joint venture agreement." [Doc. 26, p.16] According to Moreno and TGS, "the Term Sheet [merely] memorializes the terms of [the] pre-existing joint venture agreement," and the Term Sheet is referenced in the First Amended Counterclaim only "as evidence of the terms of the preexisting agreement." [Id. at 15, 16]

In support of their argument, Moreno and TGS rely upon *Richbell Information Services, Inc. v. Jupiter Partners*, L.P., 309 A.D.2d 288 (N.Y.A.D. 2003), a New York case decided pursuant to New York law. All parties argue, and for these purposes only, this Court will assume New York law applies to this issue before this Court. However, as will become clear within this opinion, such an assumption cannot, and will not, be made for all issues now before the Court.

Page 9 of 28

In *Richbell*, plaintiffs alleged defendants "engaged in a highly sophisticated scheme to misappropriate plaintiffs' interest in an alleged joint venture worth over $600 million." *Id.* at 289. Plaintiffs asserted claims for "breach of contract, breach of fiduciary duty and various business torts." *Id.* The New York trial court dismissed all claims pursuant to defendants' motion to dismiss. *Id.* On appeal, the New York Supreme Court, Appellate Division, found the trial court "correctly determined that the parties were not members of a joint venture by virtue of express written agreements," as the letter agreements upon which plaintiff relied were unenforceable preliminary agreements. *Id.* at 297 (one letter referred to defendants' uncompleted due diligence, used language reflecting that an agreement might be reached at some time in the future, and referred to the attached preliminary term sheet as a "draft"; a second letter accompanying a new term sheet "clearly conditioned the transaction upon the execution of definitive agreements"). However, the New York appellate court held the trial court erred in dismissing plaintiffs' claims premised on "the breach of a fiduciary duty created by the joint venture," finding "[t]he complaint adequately set[] forth the requisite indicia of a joint venture based upon the *implied* agreement evidenced by the parties' conduct." *Id.* (emphasis in original) The appellate court noted "[t]he intention to commit an agreement to writing will not prevent contract formation prior to execution." *Id.* After setting forth the elements of a joint venture, the appellate court found, "[g]iving plaintiffs the benefit of every favorable inference, such intent [to form a joint venture] may be implied *from the totality of the conduct alleged here.*" *Id.* at 298 (emphasis added).

*Richbell* is factually distinguishable from the matter before this Court. In *Richbell*, the parties essentially went forward with their joint venture agreement, despite never having executed "definitive agreements," as contemplated by their written preliminary agreements. Specifically,

plaintiffs contributed their equity interests in a company they owned and controlled worth $167 million, and defendants contributed cash, to form a holding corporation to carry out the joint venture; the purpose of the joint venture (to acquire a specific company) was accomplished; the parties entered into a stockholder agreement for the holding corporation; and the parties began work on an IPO. *Id.* at 290-93. Assuming *arguendo* Moreno and TGS's counterclaim and third-party complaint asserts a cause of action for breach of fiduciary duties based upon a joint venture preexisting the Term Sheet, unlike *Richbell*, in this matter, Moreno and TGS have not alleged sufficient facts that a joint venture "may be implied from the totality of the conduct alleged here." Id. at 298.

Regardless, the Court agrees with GEOG and GE that Moreno and TGS have not set forth sufficient facts in their counterclaim or third-party complaint to allege the existence of an oral agreement, preexisting the Term Sheet, to support their claim of breach of a joint venture/partnership agreement. [Doc. 30-2, pp. 2-3] A review of the counterclaim and third-party complaint makes plain Moreno and TGS, at this juncture, have based this particular claim on the provisions of the written Term Sheet.[5]   Accordingly, the Court finds Moreno and TGS, at this juncture and under this procedural review, have failed to sufficiently state a claim for breach of an oral joint venture/partnership agreement in their pleadings, which preexisted the Term Sheet, for purposes of Rule 12(b)(6).

The Court now turns to the written Term Sheet to determine whether Moreno and TGS have sufficiently pleaded a claim of breach of partnership/joint venture duties, or alternatively, breach of an agreement to form a partnership/joint venture within their pleadings for purposes of Rule 12(b)(6). First, it is an alarming omission that the parties have not specifically addressed the law

---

[5]*See e.g.* Doc. 12, ¶¶ 20, 23-32, 42-44.

applicable to the Term Sheet, but have only supported their arguments as to *all* claims with the law of the State of New York. The Court, for these purposes only, again, will accept the parties' assertion New York law applies to this claim as well.

Nevertheless, this Court must remind the parties that in diversity cases, the court must apply the choice-of-law rules of the forum state in which the federal court sits. *Pioneer Exploration, L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 512 (5th Cir. 2014). In this matter, the Note provides, "This note shall be governed by, and construed in accordance with, the law of the State of New York (without giving effect to the conflicts of laws principles thereof)." [Doc. 1-1, pp. 9-10 (emphasis omitted)] *The Term Sheet does not contain such a choice of law provision.* However, the Note incorporates the Term Sheet by reference. [Id. at §§ 4(e); 5(d)(f)(g)(i)(m); 6(a)(ix); 7(a); 9] There has been no evidence presented, or argument made, that these experienced businessmen intended either document to be read in isolation. *Delhomme Industries, Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049, 1056 (5th Cir. 1982). Accordingly, for these purposes only, the Court will assume within the confines of the procedural vehicle chosen, these two documents should be read together, and that the parties chose New York law to apply to both the Note and the Term Sheet through the choice of law clause. *Id.*[6]

Turning to whether the choice of law provision should be given effect, the Court finds, for purposes of these motions, that the choice of law provision should apply. Even applying Louisiana's conflict of laws provisions, Louisiana courts recognize and honor contractual choice of law provisions, "except to the extent that law contravenes public policy of the state whose law would

---

[6] *See also This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir. 1965); *Singer v. Xipto Inc.*, 852 F.Supp.2d 416, 424 (S.D.N.Y. 2012).

otherwise be applicable. . . .". La. Civ. Code art. 3540; *see also Delhomme* at 1057 (Louisiana courts permit parties to stipulate in their contract which state's law will govern the contract). "A choice of law provision in a contract is presumed valid until it is proved invalid." *Id.* at 1058. "Courts are reluctant to declare such provisions void as against public policy." *Id.* (citing *Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356-57 (1931)). "They will do so only if there is 'an express legislative or constitutional prohibition or a clear showing that the purpose of the contract contravenes good morals or public interest.'" *Id.* (quoting *Meinerz v. Treybig*, 245 So.2d 557, 559 (La.App. 1971)). "One state's law does not violate another state's public policy merely because the laws of the two states differ." *Id.* "Courts favor, and tend to uphold, choice of law provisions in contracts, . . . particularly when such provisions are used in interstate transactions." *Id.* In accordance with the foregoing principles, at this juncture and for these purposes and issues only, the Court finds New York law governs interpretation of the Term Sheet.

As previously noted, movants GEOG and GE argue the Term Sheet "is expressly not binding on the parties," and thus, no joint venture or partnership was ever created.  [Doc. 35 & 37, p. 3 (emphasis omitted)] According to GEOG and GE, the Term Sheet merely "outlines how the parties *might* structure an equity contribution by GEOG to TGS, *if* GEOG deepened its relationship with TGS to the point of becoming an equity partner/joint venturer." [Id. at 4 (emphasis in original)] As movants characterize it, the Term Sheet "is preliminary and non-binding because the parties failed to agree on numerous material terms," and the Term Sheet does "not manifest a clear intent to form a joint venture." [Id. at 5] Accordingly, GEOG and GE argue Moreno and TGS's claim for breach of partnership/joint venture duties, or alternatively, breach of agreement to form a partnership/joint venture, fails to state a claim upon which relief may be granted. The Court finds as follows:

1.    **Applicable Law**

As noted, for these purposes only and as to these select issues only, this Court will accept the parties' assertion that New York law applies.  Under New York law, "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. *Adjustrite Systems, Inc. v. GAB Business Services, Inc.*, 145 F.3d 543, 548 (2nd Cir. 1998). "In some circumstances, however, preliminary agreements can create binding obligations." *Id.* Generally, "binding preliminary agreements fall into one of two categories." *Id.* Those in the first category - "Type I agreements" - constitute "fully binding agreements, which are created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2nd Cir. 2008)(alterations omitted). Parties who have entered into Type I agreements are "fully bound to carry out the terms of the agreement even if the formal instrument is never executed." *Id.* Courts apply a four-part test to determine whether a Type I agreement, calling for the execution of a formal instrument, is enforceable despite the absence of such an executed final instrument:

> (1) whether there is an expressed reservation of the right not to be bound in the absence of a writing;
>
> (2) whether there has been partial performance of the contract;
>
> (3) whether all of the terms of the alleged contract have been agreed upon; and
>
> (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Brown v. Cara*, 420 F.3d 148, 154 (2nd Cir. 2005); *see also Adjustrite*, 145 F.3d at 549.

Binding preliminary agreements in the second category - "Type II agreements" - constitute

preliminary commitments that are "binding only to a certain degree because the parties agree on certain major terms, but leave other terms open for further negotiation." *Id.* (alterations omitted). Type II agreements "do[] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." *Adjustrite*, 145 F.3d at 548. If the parties "fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." *Id.* The Second Circuit has found "'giving legal recognition to [Type II agreements] serves a valuable function in the marketplace . . . permit[ting parties] to make plans in reliance upon their preliminary agreements and present market conditions . . . [without] expend[ing] enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms.'" *Brown* , 420 F.3d at 157 (alterations in original)(quoting *Teachers Ins. & Annuity Ass'n. v. Tribune Co.*, 670 F.Supp. 491, 499 (S.D.N.Y. 1987)). The Second Circuit utilizes a five-part test to determine whether an agreement is a Type II agreement and therefore imposes an obligation to negotiate in good faith:

> (1) whether the intent to be bound is revealed by the language of the agreement;
>
> (2) the context of the negotiations;
>
> (3) the existence of open terms;
>
> (4) partial performance; and
>
> (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

*Brown*, 420 F.3d at 157.

The key element in determining whether a preliminary agreement exists is intent – whether the parties intended to be bound and, if so, to what degree. *Adjustrite*, 145 F.3d at 548. "To discern

that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'" *Id.* at 549 (quoting *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1986)). Subjective evidence of intent is generally not considered. *Id.* at 549.   In determining whether the parties intended to be bound, the court may consider "correspondence or other preliminary or partially complete writings." *Winston*, 777 F.2d at 81 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 27, comment c (1981)). "Under New York law, whether a binding agreement exists is a legal issue, not a factual one." *Vacold,* 545 F.3d at 123.

### 2.   Application

#### a.   Moreno and TGS have failed to state a claim for breach of a "Type I" preliminary agreement in their pleadings

"The first factor, which is frequently the most important, requires the Court to determine whether the language of the contract discloses an intention by the parties to be bound to the ultimate objective." *Brown,* 420 F.3d at 154. "This factor is frequently determined by explicit language of commitment or reservation." *Id.* "Indeed, if the language of the agreement is clear that the parties did not intend to be bound, the Court need look no further." *Cohen v. Lehman Brothers Bank, FSB,* 273 F.Supp.2d 524, 528 (S.D.N.Y. 2003)(citing *Cohen v. Singer*, 4 Fed.Appx. 38, 39 (2d Cir. 2001)(finding no binding agreement based solely on first factor)); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989)(where language of agreement was clear that parties did not intend to be bound, the court "need look no further than the first factor").

Here, the language utilized in the Term Sheet explicitly characterizes it as "the *proposed* terms of a transaction" and "a statement of our *present mutual intentions* with respect to the *proposed* transactions." [Doc. 1-1, pp. 31, 41 (emphasis altered)]  The Term Sheet states that any binding agreement will be "subject to, among other things, completion of due diligence, acceptable

definitive documentation," etc. [Doc. 1-1, p. 31] Most importantly, the agreement explicitly states,

"*No legally binding agreements or obligations of any party are created by this Summary of Principal Terms.*" [Id. at 41 (emphasis added)] The Term Sheet is devoid of any indication that the parties intended for it to form a binding obligation, rather, the express language is to the contrary. Accordingly, the Court finds Moreno and TGS have failed to state a claim for breach of a "Type I" partnership/joint venture agreement within their pleadings, and therefore, GEOG and GE's motions to dismiss pursuant to Rule 12(b)(6) are GRANTED with regard to Moreno and TGS' claim of breach of partnership/joint venture duties.

        **b.**        **Moreno and TGS have sufficiently pleaded a claim for breach of a "Type II" preliminary agreement**

                **i.**        **Whether the intent to be bound is revealed by the language of the agreement**

"The essence of a Type II preliminary agreement is that it creates an 'obligation to negotiate the open issues in good faith in an attempt to reach the [ultimate contractual objective] within the agreed framework.'" *Brown*, 420 F.3d at 157 (quoting *Tribune*, 670 F.Supp. at 498). "[T]he language of the document need only evidence 'an intention to be bound to the [document] as a general framework in which the parties will *proceed in good faith toward* the [contractual] goal.'" *Learning Annex Holdings, LLC v. Whitney Educ. Group, Inc.*, 765 F.Supp.2d 403, 411 (S.D.N.Y. 2011)(alterations, emphasis in original)(quoting *Brown*, 420 F.3d at 157). The language of the Term Sheet is the most important factor in determining whether its terms are binding on the parties. *Arcadian*, 884 F.2d at 72.

In this matter, the relevant language reads:

This summary of principal terms does not constitute a contractual commitment of any party but merely represents the proposed terms of a transaction. Any commitments

will be subject to, among other things, completion of due diligence, acceptable definitive documentation, with among other things, acceptable representations, warranties, covenants and events of default, and requisite General Electric Company ("GE") internal approvals.

. . . .

It is understood that this Summary of Principal Terms constitutes a statement of our present mutual intentions with respect to the proposed transactions described herein and does not contain all matters upon which agreement must be reached in order for such proposed transactions to be completed. The parties agree to work diligently and in good faith towards the execution of definitive documents necessary to consummate such proposed transactions. No legally binding agreements or obligations of any party are created by this Summary of Principal Terms. In particular, the closing of the First Contribution would be subject to the negotiation, execution and delivery of appropriate definitive documents.

[Doc. 1-1, p. 31(emphasis omitted), p. 41]

Clearly, the Term Sheet did not obligate the parties to reach a final agreement on the terms of a joint venture, as its terms specifically foreclose such an interpretation. The final paragraph of the Term Sheet, however, contains language obligating the parties "to work diligently and in good faith towards the execution of definitive documents necessary to consummate such proposed transactions." In analyzing a letter of intent containing essentially the same provisions, the United States' Second Circuit Court of Appeal found the letter of intent "was expressly made non-binding except for the obligation to negotiate a definitive agreement in good faith." *L-3 Communications Corp. v. OSI Systems, Inc.*, 283 Fed.Appx. 830, 833 (2d Cir. 2008)[7]; *see also e.g. Gas Natural, Inc.*

---

[7]The exact language of the letter of intent referenced in *L-3 Communications, supra*, is found in *L-3 Communications Corp. v. OSI Systems, Inc.*, 2004 WL 42276, *9 (S.D.N.Y.). There, the letter of intent read as follows:

[The Letter of Intent] does not contain all matter upon which agreement must be reached in order for the transaction to be consummated and therefore does not constitute a binding commitment or agreement with respect to the Transaction. A binding commitment and agreement with respect to the transaction shall result only from the execution of definitive agreements and related documents, subject to the terms and conditions contained therein.

*v. Iberdrola, S.A.*, — F.Supp.2d —, 2014 WL 3545466, *6 (S.D.N.Y.)("That Defendants undertook to negotiate 'in good faith' over a specific period suggests voluntary acceptance of an obligation, not simply a description of the current state of negotiations"); *Tribune*, 670 F.Supp. at 498 ("[P]arties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement"). If, as Moreno and TGS allege, GEOG and GE "made no efforts whatsoever toward the execution of definitive documents necessary to consummate the proposed transactions" during the relevant time period, arguably, movants would have breached their agreement to negotiate in good faith. *See e.g. L-3 Communications Corp. v. OSI Systems, Inc.*, 2004 WL 42276, *10. In light of the foregoing, the Court finds this factor supports finding that a breach of a Type II preliminary agreement has sufficiently been pleaded for purposes of Rule 12(b)(6).

### ii.   The context of the negotiations

"An agreement is likely to be a type II preliminary agreement . . . when it is 'subject to numerous contingencies that ha[ve] the potential to dramatically affect planning, execution, and management' of the ultimate contractual objective." *Vacold*, 545 F.3d at 127 (alterations in original)(quoting *Brown*, 420 F.3d at 158). "Parties enter into type II agreements -- committing themselves to good-faith efforts to reach agreement on the remaining terms, but not to the ultimate objective -- when they seek to 'preserv[e] flexibility in the face of future uncertainty' rather than establish 'determinative methodologies' that will apply to future contingencies." *Id.* (quoting *Brown*

---

*L-3 Communications*, 2004 WL 42276, at *9 (alterations added). The letter of intent additionally provided the parties agreed to "proceed to prepare and negotiate in good faith definitive agreements reflecting the terms and conditions contained in [the Letter of Intent]." *Id.*

at 158). In *Brown*, the Second Circuit determined that the context of the negotiations favored the finding of a Type II agreement, because the parties were discussing a future development project subject to many contingencies. *Brown* at 158. There the parties, by their agreement, "elected to negotiate a general framework within which they could proceed while preserving flexibility in the face of future uncertainty." *Id*. This, it would seem, is illustrative of the uncertain climate in which it is alleged the parties herein were negotiating a joint venture. Accordingly, the Court finds this factor weighs in favor of finding that breach of a Type II agreement has sufficiently been pleaded for purposes of Rule 12(b)(6).

### iii.     The existence of open terms

While "the existence of open terms creates a presumption against finding a [Type I] binding contract . . ., these same omissions may actually support finding a binding Type II agreement." *Brown*, 420 F.3d at 158. "This is so even where the open terms are 'critical to every aspect' of the parties' ultimate contractual objective. *Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*, 264 Fed.Appx. 36, 38 (2d Cir. 2008)(quoting *Brown* at 158). The Term Sheet in this matter contains several open terms, such as the sharing of profits, control, and contributions. [Doc. 1-1, pp. 32, 34, 36] This supports the conclusion that the parties created a general framework in which to work, with the expectation that they later would agree on the precise details of the joint venture within the framework described in the Term Sheet. *See e.g. Brown* at 158. Accordingly, the Court finds this factor supports finding that breach of a Type II agreement has been sufficiently pleaded for purposes of Rule 12(b)(6).

### iv.     Partial performance

According to the facts asserted in the counterclaim, in accordance with the Term Sheet,

defendants "used the $25,000,000 [in funds from plaintiff] to purchase the turbines and other equipment in pursuit of the joint venture Business Plan" [Doc. 12, ¶ 20]; TGS obtained the "consent of the shareholders and directors of GFES" to the joint venture [Doc. 12, ¶ 43]; and all other conditions required for funding of the First Contribution which were under defendants' control "were fully performed" [Doc. 12, ¶¶ 31-32, 43, 44, 48, 55].[8] Additionally, movants completed a "Product Engineering Review of Power Generation Units," which TGS passed. [Doc. 12, ¶ 36] Finally, movants and defendants finalized a Business Plan in accordance with the Term Sheet. [Doc. 12, ¶ 22] These actions weigh in favor of finding that a breach of a Type II agreement has been sufficiently pleaded for purposes of Rule 12(b)(6). *See e.g. Brown*, 420 F.3d at 158; *EQT Infrastructure Ltd. v. Smith*, 861 F.Supp.2d 220, 230 (S.D.N.Y. 2012).

> **v.  The necessity of putting the agreement in final form, as indicated by the customary form of such transactions**

"Type II agreements, by definition, comprehend the necessity of future negotiations and contracts." *Brown*, 420 F.3d at 158. The Court finds the applicable law suggests the necessity of putting the agreement in final form – explicitly contemplated by the Term Sheet – does not preclude a finding of a Type II agreement. [Doc. 1-1, p. 41 (regarding "execution of definitive documents")] Accordingly, the final factor is neutral in this matter.

After reviewing these five considerations, the Court concludes defendants' well-pleaded facts are sufficient to state a cause of action for breach of a Type II preliminary agreement to form a

---

[8]Presumably, those conditions were: (1) "TGS, GFES, and TPT entering into assembly, installation, product development, maintenance and licensing agreements"; (2) GFES board and GFES minority stockholder, TPT governing body and MTT governing body approvals and consents, including, with respect to GFES, board and minority stockholder waivers of corporate opportunities regarding the transactions"; and (3) "[f]airness opinion regarding related party assets of the transactions among TGS, GFES and TPT." [Doc. 27-2, ¶ 24; Doc. 1-1, p. 33]

partnership or joint venture for purposes of Rule 12(b)(6). Accordingly, the threshold motion to

dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) is DENIED as to defendants'

claim of breach of an agreement to form a partnership/joint venture.

### C.     Breach of Fiduciary Duty

Moreno and TGS make the following factual allegations in their counterclaim and third-party

complaint in support of their claim for breach of fiduciary duty:

> 41.     Moreno, GEOG and GE had agreed to be partners or joint venturers, and partners and joint venturers owe one another a fiduciary duty.

> . . . .

> 44.     GEOG and GE breached their fiduciary duties to TGS and Moreno by, among other things, (i) failing to make the First Contribution, (ii) failing to put forth good faith efforts towards the execution of definitive agreements necessary to consummate the proposed transactions, and (iii) failing to put forth good faith efforts to fulfill the prerequisites of the First Contribution. As such, any such prerequisites not completed by the parties have been waived. TGS and Moreno fully performed their part of the bargain.

[Doc. Nos. 12 & 15 at ¶¶ 41, 44]

In general, the allegations of breach arise out of the parties' contractual duties. *Louisiana v.

Guidry*, 489 F.3d 692, 705 (5th Cir. 2011)("[A]n action for breach of a fiduciary duty arises from the

special relationship between the fiduciary and the one who claims the duty [or 'principal'], which

therefore arises in contract (or quasi-contract)") (emphasis, alterations in original)); *Tel-Phonic

Services, Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1142 (5th Cir. 1992). Accordingly, notwithstanding

the parties' failure to specifically address this nuance, for purposes of these motions, the Court will

apply the law agreed by the parties to govern the alleged contract - New York law - to this claim.

Under New York law, participants in a joint venture owe one another fiduciary duties.

*Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 432 (2d Cir. 1995); *Argilus, LLC v.

*PNC Financial Services Group, Inc.*, 419 Fed.Appx. 115, *2 (2d Cir. 2011). To establish a claim for breach of fiduciary duty, a claimant must prove: "(1) the existence of a fiduciary relationship; (2) misconduct by defendant constituting a breach of its fiduciary duty to plaintiff; and (3) damages to plaintiff directly caused by defendant's misconduct." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F.Supp.2d 291, 305-06 (S.D.N.Y. 2010); *see also Johnson v. Nextel Communications, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). In this matter, the pleadings reflect the parties' negotiations did not lead to the successful, formal creation of a joint venture, as discussed in Section II(B), *supra*, and the argued foundational prong for a breach of fiduciary duty under New York law is therefore absent. Consequently, as no other basis for the existence of a fiduciary duty under New York law was pleaded or argued, this Court finds, based upon the pleadings, Moreno and TGS have failed to plead sufficient facts within their pleadings to support the claim of the existence of a fiduciary relationship under New York law. Accordingly, the motion to dismiss defendants' claim of breach of fiduciary duty is GRANTED for failure to state a claim pursuant to Rule 12(b)(6).

### D.    Promissory Estoppel

Defendants Moreno and TGS have brought a claim of promissory estoppel, asserting in pertinent part:

> 61.    In the joint venture agreement between Moreno and GEOG, GEOG and GE made a promise to TGS and Moreno that the $25,000,000 "loan" that is the subject of this lawsuit would not actually be repaid, but would be converted into an ownership interest in TGS.

> 62.    In executing the Note, TGS and Moreno reasonably and substantially relied on GEOG's and GE's promise to convert the amounts owing under the Note to an ownership interest in TGS.

> 63.    GEOG and GE were aware that substantially all of TGS's assets would be tied up in the equipment purchased with the proceeds of the Note, and that repayment at the Maturity Date would not be feasible. GEOG and GE knew or should

have known that Moreno and TGS would rely on its promise to convert the Note to an ownership interest in TGS.

> 64.    In reliance on GEOG's and GE's promises, TGS and Moreno used the $25,000,000 to purchase Honeywell engines and other equipment in furtherance of the joint venture. When GEOG demanded payment on the Note rather than converting the Note to an ownership interest in TGS, that reliance proved significantly detrimental to TGS and Moreno because the funds GEOG demanded in repayment of the Note were all tied up in equipment.

[Doc. 12, pp. 13-14]

GEOG and GE have not addressed this claim in any fashion, and therefore, have not addressed how the above allegations fail to state a claim upon which relief may be granted. Accordingly, the motion to dismiss is DENIED as to Moreno and TGS's claim of promissory estoppel.[9]

### E.    Fraud and Fraud in the Inducement

Defendants Moreno and TGS have brought a claim of "Fraud and Fraud in the Inducement," asserting in pertinent part:

> 69.    Moreno and TGS were induced to execute the Note under the pretense that GE and GEOG needed a "safety engineering study" completed prior to funding the joint venture and that the Note itself was merely a stop-gap measure.

> 70.    Moreno was induced to sign a personal guaranty under Calhoun's assurance that it "would never be called" because the Note would be converted into equity within 30 days.

> 71.    GEOG and GE could not have intended the Note was actually a loan,

---

[9]Should a future dispositive motion be filed addressing promissory estoppel, the parties will be required to address the law applicable to this specific claim before the Court will address the merits. The parties should be cognizant of the fact that under Louisiana law, a claim of "detrimental reliance" (the civilian counterpart to "promissory estoppel") can lie in contract or tort. *See e.g. Fietz v. Southland Nat. Ins. Co.*, 484 F.Supp.2d 535, 540-42 (W.D.La. 2007). Whether this is also the case under New York law is not known. Again, neither party has addressed whether Louisiana, New York, or another body of law might apply to this particular claim, nor has either party addressed whether the applicable law's characterization might impact the claim made.

despite its actual wording. It is beyond the realm of commercial reasonableness to assume that a lender would loan a start-up company $25 million, the proceeds of which were required to purchase specific equipment, and expect the start-up company to repay the loan within 120 days. This is especially the case where the start-up company's assets consist primarily of the equipment purchased.

72.     The Term Sheet contemplated that GE/GEOG would make the First Contribution on or about June 15, 2013, just 32 days after the Note was executed. During this brief period, GEOG and GE did nothing in furtherance of its obligations to the joint venture. Rather, GEOG and GE engaged in a course of conduct which delayed and stalled the joint venture funding and induced Moreno and TGS into believing the joint venture would ultimately be funded. In truth, GEOG and GE never intended to fund the joint venture nor become an equal partner in the business.

[Docs. 12 & 15 at pp. 14-15]

The motion to dismiss with regard to this claim must be denied.  First, neither party has addressed whether Louisiana, New York, or another jurisdiction's body of law might apply to this claim, nor have the parties addressed whether the claim lies in contract, tort, or both. In diversity cases, the court must apply the choice-of-law rules of the forum state in which the federal court sits. *Pioneer Exploration, L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 512 (5th Cir. 2014). Pursuant to Louisiana law, a fraud claim may arise in both contract and in tort. *Clark v. Constellation Brands, Inc.*, 348 Fed.Appx. 19, 21 (5th Cir. 2009)(citing *Griffin v. BSFI Western E & P, Inc.*, 812 So.2d 726, 734 (La.App. 1 Cir. 2002)).[10] Such duality has legal consequence. It is unknown whether New York law allows the same possible duality.

Furthermore, the Court finds even were New York substantive law to be applied to this claim, this Court would deny the present motion to dismiss defendants' claim of fraudulent inducement based upon the limited and insufficient briefing before it at this time. Essentially, GEOG and GE

---

[10]As stated in *Clark*, "Even when a contract exists between the parties, unless a specific contract provision or duty is breached, Louisiana treats the action as tort. In other words, the mere fact that the circumstances arose in the context of a contractual relationship does not make the cause of action contractual." *Clark*, 348 Fed.Appx. at 21, 22 (internal citations omitted).

argue Moreno and TGS cannot rely upon oral statements to support their claim of fraudulent inducement, and therefore, defendants have failed to state a claim upon which relief may be granted. However, a cursory review of New York law suggest New York law "permits the use of parol evidence to prove a claim of fraud in the inducement, even where the written contract contains an integration, or merger, clause." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). For all of these reasons, the motion to dismiss defendants' claim of "fraud and fraud in the inducement" pursuant to Fed. R. Civ. P. 12(b)(6) is DENIED, as movants have failed to carry their burden and show they are due the relief requested.

## III.   Motion for Judgment on the Pleadings Or, Alternatively, Summary Judgment

By this motion, plaintiff GEOG, also, seeks judgment in its favor against defendants' TGS and Moreno as follows: (1) awarding GEOG $25,000,000.00 in principal, as well as interest on that amount[11]; (2) "render[ing] judgment recognizing and maintaining the rights of GEOG to enforce the 'Loan Documents,' as that term is defined in the Senior Secured Promissory Note"; (3) "render[ing] judgment recognizing and enforcing all of GEOG's security interests in the Collateral, and that GEOG's rights be maintained as first in rank and priority as against all other persons with respect to the Collateral"; (4) "render[ing] judgment ordering and requiring Defendants to deliver possession, custody, and control of all Collateral to GEOG . . . and authorizing GEOG to sell same at public or private sale"; and (5) "for such other and further relief to which it may be entitled in law and equity." [Doc. 19-1, pp. 18-19]

In support of its motion, GEOG argues that because defendants "failed to re-pay in full the Loan . . . on or prior to the parties' extended Maturity Date," an "Event of Default" has occurred

---

[11]According to plaintiff, as of January 31, 2014, interest in the amount of $2,467,283.80 was owed. [Doc. 19-1, p. 18]

under the Loan Documents, thus entitling GEOG to "to the full and punctual payment and performance of the principle and interest it advanced to TGS, and which Moreno personally guaranteed." [Id.] GEOG cites various provisions of the Loan Documents which it contends "unambiguously confirms Defendants' obligations to repay GEOG." [Doc. 19-1, pp. 9-10]  GEOG then concludes, "Defendants' only so-called defense to repayment is that the Loan was somehow GEOG's equity contribution to a joint venture with TGS. Such a theory is contrary to the express terms of the Loan Documents." [Id. at 12]

Defendants Moreno and TGS argue the Note is not due or payable, because GEOG breached its obligations set forth in the Term Sheet, which was incorporated into the Note. [Doc. 27, pp. 20-21] Moreno and TGS further argue if successful on their claims and defenses of fraud and estoppel, "there would be no obligation to pay under the Note because the Note would be equitably converted into an equity interest in TGS." [Id. at 25; *see also* id. at 22-25] In light of the foregoing, Moreno and TGS assert the "motion for summary judgment is premature, and any decision on the summary judgment motion should be deferred until after the counterclaims are decided." [Id. at 26]

Again, for these purposes only, the Court will accept the parties' assertion New York law applies.  Pursuant to New York law, a prima facie showing of default on a loan can be overcome by a successful defense of estoppel, and a successful claim of fraud can lead to rescission of a contract. *See e.g. Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 575 (2d Cir. 1969); *Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2d Cir. 1976); *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 183 (N.Y. 1982); *The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.*, 413 F.Supp. 555, 558-59 (D.C.N.Y. 1976).[12] As the Court has made no determination as to the

---

[12]The Court additionally notes should Louisiana law apply to the claims of fraud and estoppel and/or to the defense of estoppel, success on those claims/defenses could also lead to rescission of the

merits of the foregoing defenses and claims in light of the limited and insufficient briefing before it, the Court DENIES GEOG's motion for summary judgment as premature, and for failure to carry their burden to show they are due the relief requested.

The Court likewise DENIES GEOG's motion for judgment on the pleadings for those reasons set forth in Section II(A)(2), *supra*.

## IV.   Conclusion

For all of the reasons set forth above, the motions to dismiss filed by GE Oil & Gas Inc. and General Electric Company [Docs. 18, 20] are DENIED IN PART and GRANTED IN PART, and the motion for summary judgment filed by GE Oil & Gas Inc. [Doc. 19] is DENIED in its entirety.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this _____11th_____ day of February, 2015.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

contract, or specific performance. *See e.g. Clark*, 348 Fed.Appx. at 21; *Angelo & Son, LLC v. Piazza*, So.3d 705, 709-711 (La. 3rd Cir. 2008); *Kethley v. Draughon Business College, Inc.*, 535 So.2d 502, 506 (La.App. 2 Cir.,1988); La. Civ. Code art. 1967, cmt (e). However, again, neither party has properly addressed the threshold legal issue of *what law applies to each claim made* - a fatal flaw to any legal argument.